FRANK MILLSLAGLE V. STATE OF NEBRASKA.
290 N. W. 725

FILED MARCH 8, 1940. No. 30761.

*Greydon L. Nichols*, for plaintiff in error.

*Walter R. Johnson, Attorney General,* and *Rush C. Clarke,* contra.

Heard before SIMMONS, C. J., EBERLY, PAINE, MESSMORE and JOHNSEN, JJ., and KROGER and ELLIS, District Judges.

JOHNSEN, J.

Frank Millslagle, referred to herein as the defendant, brings error from a conviction for cattle stealing.

His first contention is that the information is defective, in charging him as an accessory instead of as a principal.

Section 28-201, Comp. St. 1929, provides that, "Whoever aids, abets or procures another to commit any offense may be prosecuted and punished as if he were the principal offender." He argues that, in view of this provision, the information fails to charge a crime in alleging that he aided and abetted another to commit the theft.

It is unnecessary for us to pass upon this contention, for defendant has failed to read the complete information. It charges that, on October 11, 1938, in Dawes county, Nebraska, he did "wilfully, unlawfully and feloniously aid and abet another, to wit, one Roy Shumway, to commit an offense, to wit, the theft of certain cattle, and did then and there and thereby steal, take and drive away certain cattle, to wit, nine head of mixed heifers, the personal property of one Gerhart Aschwege * * * the owner thereof, and against his will." Paring this verbiage, it is simply a charge that defendant, at a specified time and place, feloniously aided Roy Shumway to steal nine head of cattle belonging to Gerhart Aschwege, and so was guilty of the crime of cattle stealing under section 28-515, Comp. St. 1929. It would have been sufficient to have charged defendant, in so many words, with stealing the cattle, without undertaking to set out the manner of his participation in the crime, but the addition of this explanation to the charge that he "did then and there and thereby steal" the cattle in question did not make the information bad. *Scharman v. State*, 115 Neb. 109, 211 N. W. 613.

The next contention is that the evidence is insufficient to sustain a conviction because it depends, defendant says, solely upon the uncorroborated testimony of Roy Shumway, an accomplice, who is claimed to have wilfully sworn falsely on a material matter. While the record is not entirely clear, we gather that a complaint was filed against defendant shortly after the crime, and that defendant was discharged on preliminary hearing, when Shumway testified that he alone committed the theft. Thereafter another complaint was filed against defendant, and Shumway then testified, both on the preliminary hearing and on the trial

in the district court, that defendant and he stole the cattle together and that it was defendant who had suggested the theft. Shumway explained the contradiction in his testimony with the statement that he had originally tried to shield defendant, because defendant's wife was his sister.

It is argued that the situation is controlled by *Jahnke v. State*, 68 Neb. 181, 104 N. W. 154, where it was said: "The evidence of an accomplice should be closely scrutinized. If it appears that such witness has wilfully sworn falsely in regard to a material matter upon the trial, his evidence cannot be sufficient, if uncorroborated, to support a verdict of guilty." The *Jahnke* case is cited and quoted in the recent case of *Ruzicka v. State, ante, p.* 473, 289 N. W. 852, where we held that a conviction may rest on the uncorroborated evidence of an accomplice, when, considered with all the testimony and circumstances, it satisfies the jury beyond a reasonable doubt of the guilt of the accused, but that such evidence, if uncorroborated, is insufficient to support a verdict of guilty where it appears that the accomplice has wilfully sworn falsely in regard to material matters or otherwise shown that his evidence is unreliable.

A reading of these cases will show that in both of them the court regarded the testimony of the accomplice as demonstrating on its face that it was unworthy of belief. In the *Jahnke* case, the accomplice told one story under oath before a coroner's jury; testified to another on the witness-stand in district court; executed a subsequent affidavit repudiating his testimony on the trial; and signed, finally, an affidavit retracting his repudiation. Manifestly, a court would hesitate to approve a conviction hanging on such an unstable thread. In the *Ruzicka* case, the opinion says: "The credulity of this court is such that we cannot accept the statement of Dorothy Le Grand (the accomplice) * * * as true." Here again the court would have been failing in its duty, if it had said: "In spite of the odorous falseness of the testimony, on which the conviction rests, the responsibility is not ours, but the jury's." While it is not the court's privilege to pass upon the credibility of witnesses

or the guilt of an accused as such, it cannot consciously close its eyes to an inescapable conviction that the waters of judicial administration have been utterly polluted, nor knowingly permit its processes to move in such a channel.

The fact that an accomplice has been guilty of wilful false swearing on a material matter is a circumstance that may possibly, in a particular instance and situation, make his testimony unworthy of belief on its face, if it lacks corroboration. If such testimony appears on its face to be baldly perjurious or preposterous, and there is no independent evidence upon which a conviction can rest, the trial court should not hesitate to direct a verdict of acquittal. It is not every case, however, that requires this degree of protection. In the ordinary case, even though the accomplice may have been guilty of a conscious falsehood on a material matter, and even though his testimony is lacking in corroboration, it may not be utterly unworthy of belief on its face, and in such a situation the rights of an accused will be adequately protected if the jury are instructed that the testimony of an accomplice should be scrutinized closely for possible motives for falsification, and that where he has wilfully sworn falsely in regard to a material matter they should be hesitant to convict upon his testimony, without corroboration, and that in no case should they convict unless they are satisfied from the evidence, beyond a reasonable doubt, of the guilt of the accused. On an appeal to this court, we will scrutinize the evidence also and will not hesitate to set aside a conviction based upon the uncorroborated testimony of an accomplice, where on its face it produces an irresistible conviction of pervading taint or of inherent moral weakness which revolts our natural credulity.

To the extent that *Jahnke v. State, supra,* appears to declare that a conviction resting upon the uncorroborated evidence of an accomplice, who has been guilty of a conscious falsehood on a material matter, will in every case be set aside as a matter of law, it is modified to conform to the views herein expressed. Similarly, nothing in *Ruzicka v. State, supra,* is to be construed as in conflict herewith.

Without detailing the evidence in the present case, it is sufficient to say that it is not such as would justify us in setting aside the conviction, under the foregoing rules. It may be added that the trial court in this case gave instructions that are in harmony with the principles just discussed.

We deem it necessary to consider only one further assignment of error, based on certain testimony offered by the state in rebuttal. Defendant's wife was permitted to be asked on cross-examination: "Did Roy (Shumway, the accomplice) at that time, while you were being questioned by Mr. Davis (special agent of the Nebraska Stock Growers Association) recall or attempt to recall to your memory the fact that you were at the door when your husband left on the night of October 11th and that you cried?" To which she answered, "No." On rebuttal, Davis, over proper objection, was allowed to testify as follows: "Did Roy Shumway make any statement to his sister Mrs. Millslagle concerning the evening of October, or the evening or night of October 11, 1938, in your presence at this time?" "Yes." "And what did Roy Shumway say to Mrs. Millslagle?" "Mrs. Millslagle and Bus (Roy Shumway) were talking and Bus said, 'You remember the night I got out to your place and you came to the door and you tried to get Frank and I not to get the cattle' and she wouldn't reply to it. She didn't make any statement in regard to that." The county attorney then repeated: "You have stated that Roy Shumway called her attention to the fact that on that evening she tried to get them not to go after the cattle and she refused to admit that, is that true?"

This testimony did not impeach Mrs. Millslagle on any material point, and, in the form in which it was offered, it was clearly incompetent. It might have been material to have shown by direct proof that on the night of the theft Mrs. Millslagle sought to induce defendant and Shumway, not to steal the cattle, if that were the fact, but it was not material whether Shumway had said to her, at a subsequent time and in the absence of the defendant, "You remember the night I got out to your place and you came to the door

and you tried to get Frank and I not to get the cattle." The state accordingly had no right to question her about Shumway's statement. *Johnston v. Spencer,* 51 Neb. 198, 70 N. W. 982; *Carter v. State,* 36 Neb. 481, 54 N. W. 853. When it made the inquiry, it was bound by her answer and could not attempt to impeach it. *Swogger v. State,* 116 Neb. 563, 218 N. W. 416.

We recognize that the attempted impeachment of a witness on an immaterial matter will not ordinarily, perhaps, constitute prejudicial or reversible error. Comp. St. 1929, sec. 20-853. But in a criminal case, where immaterial and incompetent evidence is admitted which carries a direct implication of guilt on the part of the accused, it may obviously be prejudicial. Here, the indirect proof that Mrs. Millslagle sought to prevent defendant and Shumway from stealing the cattle may easily, in the conflicting state of the record, have helped to induce a conviction. Coming as it did, near the end of the trial, it was somewhat climactic, and it was only intensified when, at the close of all the evidence, the court had it read again in the presence of the jury and attempted to strike it from the record.

Defendant's right to a fair trial ought not thus to be sideswiped. The permanence of judicial administration depends as much upon the fairness of the processes by which a result is achieved as upon the justness of the result itself. No result is just which is achieved by unfair processes.

For the error stated, the judgment will be reversed and the cause remanded for a new trial. The other assignments of error do not necessitate further discussion.

REVERSED.